UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

JOSIRIS HERNANDEZ,

                    Plaintiff,                                          **OPINION AND ORDER**

          -against-                                                     17 Civ. 05891(JCM)

NANCY A. BERRYHILL
Acting Commissioner of Social Security,

                    Defendant.
--------------------------------------------------------------X

          Plaintiff Josiris Hernandez ("Plaintiff") commenced this action pursuant to 42 U.S.C. §

405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"),

which denied Plaintiff's application for Supplemental Security Income ("SSI") benefits, finding

him not disabled within the meaning of the Social Security Act (the "Act").[1]  (Docket No. 2).

Presently before this Court are (1) the Commissioner's motion for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 26), and (2)

Plaintiff's motion seeking reversal and remand of the Commissioner's decision, (Docket No.

39).[2]  For the reasons set forth herein, the Commissioner's motion is denied, Plaintiff's motion is

granted, and the case is remanded for further proceedings consistent with this opinion.

---

[1] This action is before the Court for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 23).

[2] The parties' briefs in support of their motions are hereinafter referred to as "Def. Br.," "Pl. Br." and "Def. Reply," respectively. (Docket Nos. 27, 40, 43).  All page number citations to briefs refer to the page number assigned upon electronic filing.

## I. BACKGROUND

Plaintiff was on born on September 16, 1991. (R.[3] 23).  On May 23, 2014, Plaintiff applied for SSI, alleging disability beginning September 1, 2003. (R. 123-131).  The Social Security Administration ("SSA") denied Plaintiff's application, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 86-91, 95-97).  Plaintiff, appearing *pro se*, and his mother testified before ALJ Marissa Ann Pizzuto on May 11, 2016. (R. 40-74).  On November 10, 2016, ALJ Pizzuto issued a decision finding that Plaintiff was not disabled and therefore not eligible for SSI. (R. 10-27).  The Appeals Council subsequently denied Plaintiff's request for review on June 20, 2017, and the decision of the ALJ became the Commissioner's final decision. (R. 1-7).

### A. Plaintiff's Medical Treatment

The administrative record contains medical records from treatment that Plaintiff has received for his physical and psychiatric conditions.

### 1. Treatment Related to Physical Impairments

Plaintiff had a physical examination at St. Luke's on December 26, 2013. (R. 240).  Notes from his examination indicated no chronic health problems. (R. 240).  On April 2, 2014, Plaintiff visited Deepti Patel, M.D. (R. 247).  Plaintiff reported that he suffered from headaches for the past six months. (R. 247).  Plaintiff stated that his headaches occurred almost daily, lasted for several hours and were not relieved by Advil. (R. 247)  Plaintiff reported that he watched television and played video games frequently during the daytime, slept about eleven to twelve hours, and went to the gym three to four times per week. (R. 247).  Dr. Patel indicated that

---

[3] Refers to the certified administrative record of proceedings related to Plaintiff's application for social security benefits, filed in this action on November 9, 2017. (Docket No. 16).  All page number citations to the certified administrative record refer to the page number assigned by the SSA.

Plaintiff had a deviated nasal septum and suffered from frequent headaches. (R. 248). Dr. Patel recommended decreasing the amount of time Plaintiff spent watching television and playing video games and making other lifestyle changes such as drinking more water and taking Advil. (R. 247).

Dr. Patel completed a physician's functional assessment form for the New York City Human Resource Administration on May 14, 2014. (R. 254). She stated Plaintiff carried diagnoses of headaches, asthma and sinus infections. (R. 254). Dr. Patel noted that Plaintiff was alert, had some developmental delay, and that he communicated well but required supervision. (R. 254). Dr. Patel declined to opine on Plaintiff's functional capacity pending his head scans and CT results. (R. 254).

## 2. Treatment Related to Mental Impairments

Psychotherapy notes, dated January 7, 2014, indicated that Plaintiff has a diagnosis of bipolar disorder (not otherwise specified). (R. 236). The notes stated that Plaintiff may also suffer from borderline intellectual functioning and problems with his primary support group. (R. 236). In a letter dated February 7, 2014, Murtuza Gunja, M.D., and Rayner Berrios, LCSW, reported that Plaintiff had been receiving psychiatric services at St. Luke's Psychiatric Recovery Center since March 24, 2011 and carried diagnoses of Bipolar Disorder (not otherwise specified) and Impulse-Control Disorder (not otherwise specified). (R. 244). Plaintiff was prescribed Risperdal, an antipsychotic medication. (R. 244). Plaintiff attended "monthly weekly individual psychotherapy sessions" with Mr. Berrios and monthly psychopharm management with Dr.

Gunja. (R. 244). The February 7, 2014 letter stated that Plaintiff was "currently psychiatrically stable." (R. 244).

On April 2, 2014, Dr. Patel described Plaintiff as a "boy with borderline intelligence and profound receptive and expressive language impairment." (R. 247). In his late adolescence, he was diagnosed with bipolar affective disorder. (R. 247). On May 23, 2014, Dr. Gunja completed a physician's functional assessment form for the New York City Human Resources Administration. (R. 253). Dr. Gunja listed Plaintiff's current diagnoses as bipolar disorder (not otherwise specified), impulse control disorder (not otherwise specified), and borderline intellectual functioning. (R. 253). Dr. Gunja indicated that Plaintiff did not display overt psychiatric symptoms, but he had issues with anger management. (R. 253). Plaintiff reported poor sleep and anger issues. (R. 253). Dr. Gunja also noted slightly slurred speech. (R. 253). Dr. Gunja reported that a low dose of Risperdal had been prescribed to treat Plaintiff's anger and impulsivity. (R. 253). Dr. Gunja did not opine on Plaintiff's functional capacity because an occupational therapist's formal assessment was required. (R. 253).

Plaintiff attended regular psychotherapy management sessions with physicians and therapists within the Mount Sinai network. On December 18, 2014, Plaintiff attended a psychotherapy appointment with Dr. Gunja. (R. 396). Plaintiff stated he ran out of medication, but noted no major side effects. (R. 396). Plaintiff indicated that he had difficulty falling asleep and had ongoing conflicts at home with his parents. (R. 396). On the same day, Plaintiff told Mr. Berrios that he was "doing OK" notwithstanding his interpersonal issues with his parents. (R. 394). On January 6, 2015, Mr. Berrios reported that Plaintiff was currently working part time at a supermarket with his father and uncle, was "motivated to work," and had "been stable for a long period of time." (R. 389). Similarly, on January 16, 2015, Plaintiff told Dr. Gunja he was

"happier" although he had a "heightened intensity of emotions, including anger in his chest in response to stressors." (R. 386). Plaintiff did not take his dose of Risperdal the previous night, but indicated that he slept well without it. (R. 386). Dr. Gunja prescribed Plaintiff Clonidine on a trial basis for his agitation and impulsivity and to help him sleep at night. (R. 386).

On February 19, 2015, Plaintiff reported feeling "depressed and sad" as a result of "miscommunication and arguments" with his mother. (R. 380). Dr. Gunja found that Plaintiff was "slightly irritable but at baseline." (R.380). On March 2, 2015, Plaintiff continued to express anger at his family and indicated that they had difficulty understanding him as a result of his speech impediment. (R. 372). Mr. Berrios found that Plaintiff was "psychiatrically stable." (R. 372). In a psychological assessment, dated March 25, 2015, Mr. Berrios documented Plaintiff's tumultuous relationship with his parents, noting Plaintiff's mother's history of depression and anxiety and his father's alcoholism. (R. 363). Mr. Berrios reported that Plaintiff had a history of learning disabilities and special schooling. (R. 364). He further listed him as "unemployed" and "disabled." (R. 364). While Plaintiff had "few friends," he had "a strong family support system" and was "highly motivated to work or attend a pre-vocational training." (R. 364-65).

On April 2, 2015, Plaintiff called Dr. Gunja saying he was "feeling anxious," "scared for no reason," and felt "physically agitated." (R. 362). On April 9, 2015, Mr. Berrios observed that Plaintiff appeared stable and was working on improving his communication with his family. (R. 360). On that same day, Plaintiff reported to Dr. Gunja that he was still having conflicts with his mother. (R. 357). Plaintiff stated he did not like taking Clonidine because it resulted in excessive sedation and indicated that he preferred Risperdal, which kept him "calm and with even mood." (R. 357). Dr. Gunja noted that Plaintiff "[w]ants to ultimately work." (R. 357).

Plaintiff attended his first therapy session with Rosalind Ventura, LCSW, on May 15, 2015. (R. 286). Ms. Ventura found Plaintiff "pleasant and cooperative" and "[s]table within established limits." (R. 287). Plaintiff's chief complaint was having "too many things in [his] head." (R. 287). He was unable to focus on school because he worried about his family. (R. 287). On May 21, 2015, Plaintiff told Dr. Gunja he had been "forgetting more things lately" and complained of poor sleep and memory issues. (R. 284). He suffered from poor short term recall of simple tasks such as feeding his fish and drinking water. (R. 284). Plaintiff informed Dr. Gunja that he had been attending Fountain House, a vocational program, and was motivated to enroll in a GED program beginning that month. (R. 284). Dr. Gunja informed Plaintiff that Plaintiff would start seeing a new psychiatrist. (R. 284).

Plaintiff saw his new psychiatrist, Nicholas Jesus Perez, M.D., on July 27, 2015. (R. 277). Plaintiff reported memory loss over the last two months with no recent changes in his medication. (R. 277). Plaintiff did not present any depressive, manic or psychotic symptoms. (R. 277). On August 14, 2015, Plaintiff told Ms. Venutra that he was "doing well" and that there was "less conflict at home." (R. 275). Plaintiff was taking his full dosage of medication and was able to sleep and feeling less worried. (R. 275).

At a psychotherapy appointment on September 14, 2015 with Chelsy Spencer, LMSW, Plaintiff spent most of the session discussing his family relationships. Plaintiff stated he was out of medication while his insurance was pending, but he did not display any psychotic symptoms. (R. 268). On September 21, 2015, Plaintiff reported to Dr. Perez that he felt well and did not display depressive, manic or psychotic symptoms. (R. 259). Plaintiff was not getting along with his mother, but Dr. Perez observed that Plaintiff was using good coping strategies. (R. 259).

At an appointment with Ms. Spencer on September 25, 2015, Plaintiff denied experiencing psychotic symptoms but stated he had difficulty expressing himself and speaking with others, possibly the result of a language disorder. (R. 436). The mental status exam findings were unremarkable and Plaintiff remained "stable within established limits." (R. 436). On October 26, 2015, Dr. Perez observed that Plaintiff was "feeling well today" and Plaintiff denied depressive, manic or psychotic symptoms. (R. 429). Plaintiff noted that he felt sedated during the day while taking his medication, but the medication otherwise appeared to be helping him. (R. 429).

On December 12, 2015, Ms. Spencer determined that Plaintiff was "compliant w[ith] his medication," "intermittently compliant w[ith] his treatment" and had missed several appointments. (R. 423). Plaintiff was "not high risk." (R. 423). The providers at Mount Sinai subsequently stopped treatment because they were unable to reach Plaintiff. (R. 417, 421, 422, 425, 428).

On May 10, 2016, Plaintiff informed Dr. Deepti Patel that he was suffering from visual hallucinations and he had been hospitalized in the Dominican Republic for one week as a result of his hallucinations. (R. 413). The ALJ mailed a request to Centro Medico Siglo 21 for Plaintiff's hospitalization records. (R. 232). The records from Plaintiff's hospitalization are not included in the administrative record because the post office returned as undeliverable the ALJ's request. (R. 231). Plaintiff told Dr. Patel he was ready to return to his psychiatric appointments. (R. 413). Plaintiff lost weight, and his mother reported that Plaintiff had tantrums, washed his hands excessively and changed his underwear frequently throughout the day. (R. 413-14). Plaintiff's mother also told Dr. Patel that Plaintiff saw angles when looking at the sky. (R. 414). Dr. Patel referred Plaintiff for a psychiatric follow up. (R. 414-15).

Plaintiff also saw Jessica Roca, LMSW, on May 10, 2016. (R. 416). Plaintiff further discussed his hospitalization in the Dominican Republic. (R. 417). He stated he was "seeing demons and need[ed] to kill those demons with a knife." (R. 417). Ms. Roca indicated that she would refer Plaintiff to Dr. A. Hickner. (R. 417).

## B. Consulting Physicians

The administrative record contains evaluations by three consulting physicians.

### 1. Michael Kushner, Ph.D.

Michael Kushner, Ph.D. conducted a psychiatric evaluation on June 27, 2014. (R. 255). Plaintiff reported symptoms of depression, frequent mood swings, irritability and anxiety. (R. 255). Plaintiff took Risperidone to treat his impulsivity, anger problems and insomnia. (R. 255). Plaintiff stated he had difficulty holding paid employment due to his difficulty concentrating, memory problems and frequent mood swings. (R. 255). Dr. Kushner concluded that Plaintiff's intellectual functioning was below average to borderline. (R. 255). Dr. Kushner diagnosed Plaintiff with unspecified bipolar disorder and unspecified cognitive disorder and recommended that he continue with his current psychiatric treatment. (R. 257-258). Dr. Kushner found that Plaintiff had the following functional limitations:

- Mild Limitations
  - Following and understanding simple directions and instructions
  - Performing simple tasks independently
- Moderate to Marked Limitations
  - Maintaining attention and concentration
  - Maintaining a regular schedule
  - Learning new tasks
  - Performing complex tasks under supervision
  - Making appropriate decisions
  - Relating adequately with others
  - Appropriately dealing with stress

(R. 257).  Dr. Kushner concluded that Plaintiff's evaluation was "consistent with psychiatric and cognitive problems, and these may significantly interfere with claimant's ability to function on a daily basis." (R. 257).

## 2. E. Kamin, Ph.D.

On July 7, 2014, State Agency psychiatric consultant E. Kamin, Ph.D., reviewed Plaintiff's medical records. (R. 80).  Dr. Kamin opined that Plaintiff suffered from understanding and memory limitations and opined that Plaintiff had the following limitations in mental activities:

- **Understanding and Memory**
  - Not Significantly Limited
    - Remembering locations and work-like procedures
    - Understanding and remembering very short and simple instructions
  - Moderately Limited
    - Understanding and remembering detailed instructions
- **Sustained Concentration and Persistence**
  - Not Significantly Limited
    - Carrying out very short and simple instructions
    - Performing activities within a schedule, maintaining regular attendance, and being punctual
    - Sustaining ordinary routine without special supervision
    - Working in coordination with or proximity to others without being distracted
    - Making simple work-related decisions
    - Completing a normal workday or workweek without psychological interruptions and performing at a consistent pace without unreasonable breaks
  - Moderately Limited
    - Carrying out detailed instructions
    - Maintaining attention and concentration for extended periods
- **Social Interaction**
  - Not Significantly Limited
    - Interacting appropriately with the general public
    - Asking simple questions or requesting assistance
    - Getting along with coworkers and peers without distracting them
    - Maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness
  - Moderately Limited
    - Accepting instructions from and responding appropriately to supervisors

- **Adaptation**
  - Not Significantly Limited
    - Responding appropriately to changes in work setting
    - Traveling in unfamiliar places or using public transportation
    - Being aware of normal hazards and taking appropriate precautions
  - Moderately Limited
    - Setting realistic goals or making independent plans

(R. 80). Dr. Kamin concluded that Plaintiff "appears capable of unskilled work on a sustained basis." (R. 82).

### 3. David Mahony, Ph.D.

Psychiatric consultative examiner David Mahony, Ph.D. examined Plaintiff on October 2, 2015. (R. 400). Plaintiff indicated he had initial insomnia and loss of appetite with no weight loss. (R. 400). Plaintiff's symptoms of depression included irritability and argumentative behavior. (R. 400). Dr. Mahony noted Plaintiff appeared to have cognitive defects, including difficulty learning new material. (R. 401). Upon mental status examination, Dr. Mahony observed that Plaintiff was cooperative. (R. 401). Plaintiff's speech was fluent and clear and his expressive and receptive languages were adequate. (R. 401). Dr. Mahony found that Plaintiff's thought processes were coherent and goal directed with no evidence of hallucinations, delusions or paranoia. (R. 401).

However, Plaintiff's attention and concentration were impaired due to cognitive limitations. (R. 401). Dr. Mahony observed that Plaintiff's cognitive functioning was below average, his insight was poor, and his judgment was poor. (R. 402). Dr. Mahony also stated it was "not clear if [Plaintiff] is compliant with psychiatric medication." (R. 402). Dr. Mahony diagnosed Plaintiff with major depressive disorder, moderate, atypical type. (R. 402). Plaintiff's prognosis was poor as he was not receiving any sort of occupational therapy. (R. 402). In addition, Dr. Mahony found that Plaintiff had the following functional limitations:

- Not Limited
  - Understanding, remembering and carrying out simple instructions
- Mildly Limited
  - Making judgments on simple work-related decisions
- Moderately Limited
  - Understanding, remembering and carrying out complex instructions
  - Making judgments on complex work-related decisions
  - Interacting appropriately with the public, supervisors and co-workers
  - Responding appropriately to usual work situations and to changes in a routine work setting

(R. 404-405).

## C. Plaintiff's Testimony

Plaintiff testified at the May 11, 2016 hearing before ALJ Pizzuto. (R. 40-74). At the hearing, the ALJ asked Plaintiff if he wanted a Spanish interpreter and Plaintiff responded in the affirmative. (R. 45). The ALJ went off the record. Upon returning, the ALJ stated Plaintiff informed her an interpreter was not necessary. (R. 46). The ALJ asked Plaintiff if he felt confident he could proceed in English. (R. 46). Plaintiff responded in Spanish, but the hearing continued without a Spanish-language interpreter. (R. 46-47). The Court notes that Plaintiff's testimony is not entirely clear as he spends a significant amount of time conversing with his mother in Spanish, answering inaudibly, providing answers in Spanish, or providing answers that are non-responsive to the ALJ's questioning. Plaintiff testified that he lived with his mother, father and sister. (R. 56). He graduated from high school where he received an IEP and took special education classes due to his language difficulties. (R. 56-57). Previously, Plaintiff worked in the supermarket with his father. (R. 57). Plaintiff testified that he started working in the supermarket when he was ten years old. (R. 62). Plaintiff indicated that he felt pressure while working at the supermarket and had difficulty completing his shifts. (R. 58). Plaintiff began working with his uncle and felt less pressure. (R. 59). However, he stopped working with

his uncle because of interpersonal issues. (R. 60). Plaintiff also testified that he worked at a pet store from ages 14 to 17. (R. 63).

Plaintiff testified that he saw a primary doctor, a social worker and a psychiatrist. (R. 49-50). Plaintiff also stated that he was treated at St. Luke's psychiatry department and was prescribed medication. (R. 55). Plaintiff took his medicine at night, but did not take it during the day because it made him feel as if he had "insomnia." (R. 55).

Finally, Plaintiff testified that he was hospitalized in the Dominican Republic for seven days in January 2016 because he "blacked out." (R. 51, 54, 64-72).

**D. ALJ Pizzuto's Decision**

In her decision dated November 10, 2016, (R. 10-27), ALJ Pizzuto followed the five step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since he applied for SSI. (R. 18). At step two, the ALJ found that Plaintiff had the following severe impairments: major depressive disorder, moderate bipolar disorder, impulse-control disorder and borderline intellectual functioning. (R. 18). The ALJ found that Plaintiff's asthma and headaches were non-severe impairments. (R. 18).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 19). In Plaintiff's case, the ALJ found that he had mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with respect to concentration, persistence or pace, and no episodes of extended decompensation. (R. 19). The ALJ determined that Plaintiff's impairments were insufficient to satisfy the "paragraph B" criteria under the regulation. (R. 19). In addition, the ALJ found that

the "paragraph C" criteria were not satisfied because Plaintiff was capable of functioning independently outside of a structured setting and did not have repeat episodes of decompensation. (R. 19).

Before step four of the sequential evaluation, the ALJ assessed Plaintiff's residual functional capacity and found that Plaintiff could perform a full range of work at all exertional levels but with the following nonexertional limitations: he could perform simple, unskilled work with occasional public and co-worker contact. (R. 20).

At step four, the ALJ found that Plaintiff had no past relevant work. (R. 23). The ALJ, therefore, proceeded to the fifth and final step of the sequential evaluation process. (R. 23). At step five, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity and found that Plaintiff could perform work that exists in significant numbers in the national economy. (R. 23-24). The ALJ, therefore, concluded that Plaintiff was not disabled. (R. 24).

## II. DISCUSSION

Plaintiff argues that the ALJ violated her duty to develop the record by failing to provide Plaintiff and his witness with a Spanish-language interpreter and allegedly failing to elicit testimony concerning Plaintiff's medical impairments. (Pl. Br. at 12-21). Plaintiff also maintains that the ALJ committed legal error by failing to accord the proper weight to the opinions of Plaintiff's treating physicians. (*Id.* at 21-24). Finally, Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (*Id.* at 24-26).

After summarizing the applicable legal standards, the Court addresses Plaintiff's arguments below.

## A. Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

## B. Standard of Review

When reviewing an appeal from a denial of SSI benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013)

(quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).

The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)). However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C. Failure to Provide an Interpreter

Plaintiff argues that he did not receive a full and fair hearing because he was not provided with an interpreter at the hearing. (Pl. Br. at 13). Plaintiff also contends it was improper for him to interpret for his mother, Gladiris Hernandez, instead of being provided with an interpreter. (*Id.* at 16). In response, the Commissioner argues that Plaintiff consented to continue with the hearing without the aid of an interpreter and was not disadvantaged by proceeding without one. (Def. Reply at 4). The Commissioner further maintains that Plaintiff's mother did not require an interpreter because she was not deemed a witness and was merely there to assist Plaintiff. (*Id.* at 4-5).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence," the Court "must first be satisfied that the claimant has had a full hearing

under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in original) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  The SSA has an internal policy of providing interpreters to claimants with limited proficiency in English and will provide an interpreter "to individuals requesting language assistance or when it is evident that such assistance is necessary to ensure that the individual is not disadvantaged." SSA's Program Operations Manual System, GN 00203.11; *see also* Hearings, Appeals, and Litigation Law Manual I-2-6-10.  While the SSA's internal policies are generally not binding upon the SSA, a "violation of the interpreter policy can result in the denial of a full and fair hearing." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 31 (2d Cir. 2013); *see also DiPaolo v. Barnhart*, No. 01-cv-3123(JG), 2002 WL 257676, at *8-10 (E.D.N.Y. Feb. 8, 2002) (remanding based on denial of interpreter); *Alvarez v. Comm'r of Soc. Sec. Admin.*, No. 10-890(JBS), 2011 WL 2600712, at *3 (D.N.J. June 28, 2011) ("Although the Program Operations Manual does not have the force of law, generally a violation of the interpreter policy is viewed as a failure to provide a full and fair hearing."); *Martinez v. Astrue*, No. 07-cv-699(SRU), 2009 WL 840661, at *2 n. 1 (D. Conn. Mar. 30, 2009) ("[T]raditional notions of due process would suggest that without an interpreter a claimant unable to communication in English would hardly receive a 'full hearing . . . in accordance with the beneficent purposes of the Act.'") (quoting *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).

At the beginning of the hearing, the ALJ and Plaintiff had the following exchange concerning his need for a Spanish-language interpreter:

> ALJ:  Do you feel like you would understand better if it was explained to you in Spanish?
>
> CLMT:  Yes.

> ALJ:  You would prefer to have it explained to you in Spanish?
>
> CLMT:  Mm-hmm.
>
> ALJ:  Because I could – I could see if our interpreter is available.
>
> CLMT:  Yeah.  That would be much better.

(R. 45).  The ALJ then asked Plaintiff in English if Plaintiff wanted an attorney and then went off the record in order to secure an interpreter.  Once the hearing went back on the record, the record reflects the following exchange:

> ALJ:  So the first thing – we went back on the record because Mr. Hernandez is confident that he can proceed in English.  Is that correct?
>
> CLMT:  (Speaking in Spanish.)
>
> ALJ:  You feel good about speaking in English?
>
> CLMT:  (Speaking in Spanish.)
>
> ALJ:  Okay.  And you're translating into Spanish because your mom speaks primarily Spanish.  Is that correct?
>
> CLMT:  (No verbal response.)
>
> ALJ:  Okay.  And she's here to help you, right, and to support you?
>
> CLMT:  Yes.

(R. 46-47).  The record does not clearly show that Plaintiff consented to proceeding without a Spanish-language interpreter as he continued to respond to the ALJ in Spanish.  Based on this record, the Court cannot conclude that Plaintiff agreed to continue with the hearing without a Spanish-language interpreter.

Moreover, the lack of an interpreter contributed to significant communication issues between the ALJ and Plaintiff.  Plaintiff indicated to the ALJ that he did not understand certain questions. (R. 42)  He also responded to many questions in Spanish and

17

at times appeared unable to articulate a response in English to simple questions posed by the ALJ. (R. 45-46, 55-63, 71). The record also contains numerous remarks on Plaintiff's limited English proficiency compounded by his language disorder and speech delays. (R. 259, 400, 431). Many of Plaintiff's therapy sessions took place in Spanish and he indicated to his medical providers that he had difficulty with English. (R. 247, 275, 293, 296-98, 312, 350). It is likely that had Plaintiff been provided with an interpreter, he would have been able to answer the ALJ's questions more effectively and provide useful information concerning his impairments and medical history, including information concerning his seven-day hospitalization in the Dominican Republic.

Plaintiff also argues that the ALJ's failure to provide Plaintiff's mother with an interpreter warrants remand. (Pl. Br. at 16-19). The Commissioner's argument that Plaintiff's mother was not a witness and therefore did not require an interpreter is unavailing. Plaintiff attended the hearing without any representation and was accompanied solely by his mother. The record indicates that Plaintiff's mother played a central role in Plaintiff's life. Plaintiff lived with his mother and she attended numerous psychotherapy sessions with Plaintiff. (R. 247, 255, 285, 291, 296, 413). She assisted Plaintiff with his answers at the hearing. (R. 59-60). The ALJ also questioned Plaintiff's mother about Plaintiff's work history and the contact information for the hospital where Plaintiff had been admitted. (R. 59-60, 64-70). Plaintiff argues the lack of an interpreter may have prevented the ALJ from getting the correct contact information for the hospital. The Court agrees. Given Plaintiff's dependence on his mother and her involvement in Plaintiff's treatment history, the ALJ should have provided Plaintiff's mother with an interpreter.

Accordingly, the ALJ's failure to provide Plaintiff and his mother with an interpreter deprived Plaintiff of a full and fair hearing, which constitutes legal error and warrants remand. *See Corporan v. Comm'r of Soc. Sec.*, No. 12-Civ-6704(JPO), 2015 WL 321832, at *2 (S.D.N.Y. Jan. 23, 2015) ("Remand is appropriate if the reviewing court concludes that the claimant did not receive a full and fair hearing.") (citing *Selmo v. Barnhart*, No. 01-CV-7374, 2002 WL 31445020, at *7 (S.D.N.Y. Oct. 31, 2002)).

## D. Developing Testimony from Plaintiff and Plaintiff's Mother

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). "This duty is present even when a claimant is represented by counsel . . . but it is heightened when a claimant proceeds *pro se*." *Atkinson v. Barnhart*, 87 Fed. Appx. 766, 768 (2d Cir. 2004). Consequently, an ALJ has an affirmative duty to develop the record on behalf of all claimants. *Moran*, 569 F.3d at 112. "This entails a heightened obligation to ensure both the completeness and the fairness of the administrative hearing." *Jackson v. Colvin*, No. 13-CV-5655(AJN)(SN), 2014 WL 4695080, at *15 (S.D.N.Y. Sept. 3, 2014) (citing *Cullinane v. Sec'y of Dep't of Health and Human Servs.*, 728 F.2d 137, 137 (2d Cir. 1984)); *see also Devora v. Barnart*, 205 F. Supp. 2d 164, 173 (S.D.N.Y. 2002) ("The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."). "The ALJ's duty to develop the record is further enhanced when the disability in question is a psychiatric impairment." *Jackson*, 2014 WL 4695080, at *16.

Plaintiff argues that the ALJ failed to develop the record by failing to elicit appropriate testimony from Plaintiff or his mother. (Pl. Br. at 18). The Commissioner argues that the ALJ

had substantial discretion in questioning Plaintiff and fully developed the hearing record. (Def. Reply at 6-8).

Having reviewed the transcript of the hearing, the Court finds that the ALJ encountered numerous barriers communicating with Plaintiff and his mother, which led to short or confusing answers and truncated lines of questioning. The ALJ was unable to sufficiently question Plaintiff regarding his daily activities and ability to work. The record is also devoid of any questioning related to Plaintiff's physical or psychiatric diagnoses and the impact those impairments had on Plaintiff. While the ALJ was not required to delve into every aspect of Plaintiff's medical and work history at the hearing, even the areas the ALJ did touch upon were left largely unexplored as a result of disjointed communication. Additionally, in order to make sense of Plaintiff's short, often non-responsive answers, the ALJ frequently relied upon leading questions. However, the Court is not convinced Plaintiff understood all of the questions he was being asked before answering. For example, the ALJ asked Plaintiff, "So you got in a confrontation with one of his family members, and he decided to fire you as a result?" (R. 61). In response, Plaintiff testified, "I was – [INAUDIBLE] but the boss of the supermarket said no more." (R. 61). As discussed above, many of the issues in communication could have been alleviated by use of an interpreter for both Plaintiff and his mother.

The Court disagrees with the Commissioner's contention that the ALJ was not required to question Plaintiff's mother because the ALJ determined that she was not a witness. (Def. Reply at 8). Plaintiff relied heavily upon his mother during the hearing, frequently consulting with her in Spanish so she could assist him with answering questions. The Court cannot determine on this record if Plaintiff's inability to answer questions was related solely to the interpretation issues or resulted from an intellectual disability rendering Plaintiff incapable of understanding or

answering the questions. Consequently, it was incumbent upon the ALJ to include Plaintiff's mother in the hearing in order to adequately develop the record. Indeed, at times the ALJ questioned Plaintiff's mother when it appeared Plaintiff could not answer:

> Q: Why did you stop working? If you felt less pressure and it was a better environment for you, why did you stop?
>
> WTN: (Speaking in Spanish.)
>
> Q: Why did he stop working?
>
> CLMT: (Speaking in Spanish.)
>
> WTN: He thinks – he thinks something more – people talking to him.
>
> CLMT: Yeah.
>
> WTN: He thinks something more – some people play he (phonetic) he is one problem.

(R. 59-60). As noted above, Plaintiff's mother played an important role in Plaintiff's life and would undoubtedly have been a useful source of information. In particular, Plaintiff's mother had the contact information for the hospital where Plaintiff was hospitalized for seven days due to his visual hallucinations. (R. 66-70). The ALJ concluded that the hospital Plaintiff's mother referred to was called Centro Medico Siglo 21. (R. 70). However, it is not clear if the ALJ received the correct contact information for the hospital. The ALJ was unable to obtain any hospital records from Centro Medico Siglo 21, and the post office returned the ALJ's records request.[4] (R. 231-32). On remand, in addition to questioning Plaintiff about his medical impairments, the ALJ should make another effort to obtain the medical records from Plaintiff's hospitalization with the aid of an interpreter.

---

[4] The letter to Centro Medico Siglo 21 was written in English instead of Spanish. (R. 232). Even if the letter were delivered, the lack of translation may delay receipt of any medical records.

Accordingly, the Court finds that the ALJ's failure to develop the testimony of Plaintiff and his mother deprived him of a full and fair hearing, warranting remand.

## E. Treating Physician Rule

Plaintiff argues the ALJ violated the treating physician rule by giving significant weight to the consultative examiners Plaintiff met with only once. (Pl. Br. at 21-23). The Commissioner contends that the ALJ considered all relevant assessments provided by Plaintiff's treating providers and effectively incorporated them into her conclusion regarding Plaintiff's residual functional capacity. (Def. Reply at 9-10).

In determining a claimant's residual functional capacity, the ALJ must apply the "treating source rule," also known as the "treating physician rule," which requires the ALJ to accord controlling weight to the opinions of "treating sources" when those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2).[5] If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

"'The duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating

---

[5] 20 C.F.R. § 416.927 was amended effective March 27, 2017, and the revisions apply to all claims filed before that date. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844, 5880–81 (Jan. 18, 2017). Other than the definition of "treating source" the new regulation remains substantially the same for claims filed before March 27, 2017. *Compare* 20 C.F.R. § 416.927 (version effective Aug. 24, 2012, to Mar. 26, 2017), *with id.* § 416.927 (version effective Mar. 27, 2017). For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 416.920c now apply.

physician.'" *Paredes v. Comm'r of Soc. Sec.*, No. 16-CV-00810(BCM), 2017 WL 2210865, at

*17 (S.D.N.Y. May 19, 2017) (quoting *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y.

2004)). "An ALJ cannot, of course, pay deference to the opinion of the claimant's treating

physician if no such opinion is in the record." *Id.* Consequently, "[t]he ALJ must make

reasonable efforts to obtain a report prepared by a claimant's treating physician even when the

treating physician's underlying records have been produced." *Jackson*, 2014 WL 4695080, at

*17; *see also Molina v. Barnart*, No. 04 Civ. 3201(GEL), 2005 WL 2035959, at *7 (S.D.N.Y.

Aug. 17, 2005) ("[T]he ALJ must 'make every reasonable effort to obtain not merely the medical

records of the treating physician but also a report that sets forth the opinion of the treating

physician as to the existence, the nature, and the severity of the claimed disability.'") (citation

omitted).

Once the ALJ obtains the treating source's opinion, if the ALJ does not give controlling

weight to the opinion, the ALJ must consider various factors and provide "good reasons" for the

weight given. 20 C.F.R. § 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d

Cir. 2015). These factors include (1) the length of the treatment relationship and the frequency

of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of

the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating

physician; and (6) other factors that are brought to the attention of the Court. 20 C.F.R.

§ 416.927(c)(2)-(6). "[T]o override the opinion of the treating physician . . . the ALJ must

explicitly consider" the foregoing factors. *Greek*, 802 F.3d at 375 (alteration in original) (quoting

*Selian*, 708 F.3d at 418).

In this case, the medical records indicate that Plaintiff was treated by Dr. Gunja, Dr. Perez and Dr. Patel.[6]  In addition to providing medical records, Dr. Patel and Dr. Gunja completed a physician's functional assessment form for the New York City Human Resources Administration. (R. 245, 253).  Dr. Patel could not determine Plaintiff's functional capacity and stated a determination was "pending head scans and CT results." (R. 245).  Dr. Gunja also declined to opine on Plaintiff's functional capacity and stated that an "occupational therapist's formal assessment [was] required to specify specific deficits and duration of deficits in workplace." (R. 253).  The record does not include an opinion from Dr. Perez concerning Plaintiff's functional capacity.  The ALJ sent Dr. Perez a medical source statement to fill out on October 2, 2015, but he did not complete it. (R. 157).  The ALJ did not send a medical source statement to Dr. Gunja or Dr. Patel.  It is unclear from the record if Dr. Patel rendered an assessment on Plaintiff's functional capacity after receiving Plaintiff's head scan and CT results.

The ALJ accorded "significant weight" to the opinions of Dr. Kushner, Dr. Mahony and Dr. Kamin. (R. 22-23).  The ALJ assigned these opinions significant weight because they were "consistent with evidence of some intellectual deficits, and some deficits in concentration, memory and social functioning within the home." (R. 22).  The ALJ further reasoned that the opinions were "consistent with the residual functional capacity afforded" and "consistent in finding that the cl has no limitation in ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration and maintain a regular schedule." (R. 22).

While the ALJ considered the underlying medical records from Plaintiff's treating physicians, the ALJ did not have the benefit of a report or medical source statement from any of

---

[6] Plaintiff also regularly saw licensed social workers, including Mr. Berrios and Ms. Spencer.

Plaintiff's treating physicians opining on the impact Plaintiff's medical impairments had on his ability to work. While Dr. Gunja deferred his opinion to an occupational therapist in a form prepared for the New York City Human Resources Administration, Dr. Patel indicated that her opinion was "pending" based on results from additional testing. (R. 254). The ALJ recognized the importance of obtaining an opinion from Dr. Perez by mailing him a medical source statement. (R. 157). The Court remands the case because similar efforts should have been made with Plaintiff's other treating physicians before the ALJ assigned significant weight to the opinions of Plaintiff's consultative examiners. *See Paredes*, 2017 WL 2210865, at *17; *Molina*, 2005 WL 2035959, at *6.

## F. Substantial Evidence

"'Whether the ALJ has met his duty to develop the record is a threshold question.'" *Paredes*, 2017 WL 2210865, at *17 (quoting *Hooper v. Colvin*, 199 F. Supp. 3d 796, 806 (S.D.N.Y. 2016)). "[W]here the ALJ has failed to develop the record, a reviewing court need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence." *Barrie on behalf of F.T. v. Berryhill*, No. 16 Civ. 5150 (CS)(JCM), 2017 WL 2560013, at *11 (S.D.N.Y. June 12, 2017) (order adopting report and recommendation) (internal quotation marks omitted). In this case, the Court finds that the record at the administrative hearing was not fully developed given Plaintiff's language limitations and the ALJ's failure to make reasonable efforts to obtain opinion reports from two of Plaintiff's treating physicians. *See* Sections II.C, II.D and II.E, *supra*. In light of the need for further development of the evidence, as discussed above, the Court cannot evaluate whether substantial evidence supports the ALJ's decision.

## III.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, Plaintiff's motion is granted, and the case is remanded for further proceedings consistent with this opinion.  The Clerk is respectfully requested to terminate the pending motions (Docket Nos. 26, 39) and close the case.

Dated:    December 19, 2018
       White Plains, New York

**SO ORDERED:**

_Judith C. McCarthy_____
JUDITH C. McCARTHY
United States Magistrate Judge